**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| TERRY LEE MCINTYRE, | : | |
| | : | |
| Appellant | : | 853 WDA 2017 |

Appeal from the Judgment of Sentence May 3, 2017
in the Court of Common Pleas of Clarion County
Criminal Division at No(s): CP-16-CR-0000199-2016

BEFORE:    BENDER, P.J.E, SHOGAN, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:    **FILED APRIL 11, 2018**

Terry Lee McIntyre (Appellant) appeals from the May 3, 2017 judgment of sentence of 19 to 38 years of incarceration following his jury convictions for 47 drug charges including, *inter alia*, manufacture of methamphetamine. Specifically, Appellant challenges 1) the denial of his pre-trial suppression motion and 2) the trial court's failure to merge the manufacture of methamphetamine with a child present with manufacture of methamphetamine. We affirm.

> On March 1, 2016, Pennsylvania Board of Probation and Parole (PBPP) agents Wetzel and Oliver visited 20 Best Road in Rimersburg, Pennsylvania to conduct a home plan investigation of the property for a future parolee. Prior to visiting the property, the Agents contacted the Clarion County Probation Office for background information on the property. At the time, Clarion County Probation Officer Blum had an arrest warrant for Natasha Anthony, who had absconded from probation. He had obtained information from a reliable source indicating that Anthony was

*Retired Senior Judge assigned to the Superior Court.

residing at 20 Best Road with Justin McIntyre. Probation Officers Blum and Kerle agreed to accompany Agents Wetzel and Oliver to the property to serve as back-up and to arrest Anthony if she was found at the property. Officers Blum and Kerle parked on the road outside of 20 Best Road to observe the property, while Agents Wetzel and Oliver would enter the property first and phone Officers Blum and Kerle if they saw Anthony.

The property consists of several trailers, including a green and white trailer, a camper, a shed, a garage, and several parked vehicles. The agents knocked on the door of what appeared to be the main trailer, but no one answered. As they proceeded back to their vehicle, they heard the sound of children yelling, but could not identify where the sound originated. Justin McIntyre emerged from the area near the green and white trailer and approached the agents. McIntyre immediately acted belligerent toward the agents, yelling at them to leave the property. Agent Wetzel, who had supervised McIntyre in the past, asked him whether his current parole agent knew he was at the property. McIntyre said he had permission to be on the property, but after calling his parole agent, Agent Wetzel learned that McIntyre did not have permission to be there.[1] McIntyre's parole agent requested that Agents Wetzel and Oliver take McIntyre into custody for violating his parole.

_____

[1] Later, while discussing the home plan with Mary George, the owner of the 20 Best Road property, Agent Wetzel learned that Justin McIntyre had been staying at the property for several days. McIntyre had also stayed in the green and white trailer overnight in the past.

… Agent Oliver observed McIntyre becoming belligerent, repeatedly dropping his phone, and appearing somewhat off-balance. McIntyre repeatedly put his hand into his pocket, and Agent Oliver asked him to keep his hands in view. When McIntyre refused, Agent Oliver patted him down and found three knives in one pocket and a vial containing white powder residue in another pocket. While the timeline of events is unclear, Agents Wetzel and Oliver also testified that McIntyre stated that he would test positive for methamphetamine at that time. Based on the items they had found on his person, as well as the request of his current parole agent, Agents Wetzel and Oliver handcuffed McIntyre to take him into custody.

At some point during the interaction with Justin McIntyre, Agent Wetzel telephoned Officers Blum and Kerle and requested that they enter the property to serve as back-up. Upon entering the property, Officer Blum observed [Appellant] reclined in the driver's seat of a van, with [a] woman reclined in the passenger's seat. Both appeared to be unconscious, but not in any type of distress. [Appellant] remained unconscious during the various officers' interactions with McIntyre and while Officers Blum and Kerle later retrieved Anthony from the green and white trailer.[2]

_____

[2] [Appellant] testified that he woke up and heard the probation officers loudly kicking the door to the trailer and breaking the lock to forcibly enter the trailer. He further testified that a uniformed police officer prevented him from approaching Officers Kerle and Blum, even after he told the officer that they would need a search warrant to enter the trailer. The [trial] court does not find this testimony credible, in light of the testimony of four law enforcement officers that [Appellant] was unconscious during the entire interaction with McIntyre. Further, the officers testified that no uniformed state police troopers arrived on the scene until after Officers Blum and Kerle had retrieved Anthony from the trailer and called the local state police barracks for a search warrant.

When the PBPP agents handcuffed him, McIntyre said something to the effect of, "If I'm going to jail, she's going with me." McIntyre then addressed Officers Blum and Kerle and said, "the person you're looking for is in that trailer," indicating the green and white trailer. Officer Blum pointed at the green and white trailer and said "that one?" McIntyre confirmed and further stated that "Natasha" was in the first bedroom of the trailer. The officers approached the trailer, knocked on the door, and announced their presence. When there was no response, the officers entered the trailer. While there was a padlock on a hook on the door, the hinge was not properly aligned with the door, and the lock did not actually function to secure the door. The officers were able to push the door open without touching the lock.

Officer Kerle testified that upon entering the trailer, he saw three mason jars containing white powder residue and a "bladder" from a cold compress on the floor. While approaching the room

- 3 -

where Anthony was located, he observed a gallon jug with "sludge" on the bottom sitting on the trailer floor. Officer Kerle recognized these items as elements of a one-pot methamphetamine lab. The officers then found Anthony in the room where McIntyre had indicated she would be located and placed her under arrest.

Officers Blum and Kerle reported their observations in the trailer by phone to Pennsylvania State Trooper Jared Thomas, who applied for a search warrant for the entire 20 Best Road property. The search warrant included all trailers, vehicles, residences, and other structures on the property. Law enforcement officers remained on the property for several hours while waiting for the warrant. Once the search warrant was obtained, officers searched the entire property, including [Appellant's] van. [Appellant] was passed out in the van at the time. Through the search of the property, state police uncovered many other items common to the one-pot methamphetamine lab and took statements from others on the property implicating [Appellant] in the manufacture of methamphetamine.

Opinion and Order, 3/14/2017, at 1-5 (unnecessary capitalization omitted).

Appellant was arrested and charged with 48 counts of drug-related crimes pertaining to the manufacture of methamphetamine.

Appellant filed a motion to suppress on August 15, 2016, challenging the constitutionality of the search at 20 Best Road. Following a suppression hearing, the trial court denied the motion by order and opinion on October 25, 2016, finding that Appellant did not have a reasonable expectation of privacy in the property. Pending trial, new counsel was appointed to represent Appellant. Thereafter, Appellant filed an amended motion to suppress on February 21, 2017, arguing that Appellant had a reasonable expectation of privacy in the green and white trailer. The trial court again held a suppression

hearing, and denied Appellant's motion to suppress by order and opinion on March 14, 2017, finding that although Appellant had a reasonable expectation of privacy in the trailer, Justin McIntyre consented to the search of the trailer.

Appellant was convicted following a jury trial and sentenced as indicated above.[1] Appellant timely filed a notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925. Appellant presents the following questions for our consideration.

> I.   Did the trial court err in denying [Appellant's] amended suppression motion and denying suppression of all further evidence collected as fruit of the poisonous tree?
>
> II.  Did the trial court err in failing to merge [Appellant's] manufacture of methamphetamine charge with the manufacture of methamphetamine with a child present charge?

Appellant's Brief at 4 (unnecessary capitalization omitted).

We consider Appellant's suppression claim mindful of the following.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are

---

[1] Relevant to this appeal, Appellant was sentenced at count one, manufacture of methamphetamine, to 60 to 120 months of incarceration. At counts three and four, manufacture of methamphetamine with a child present, Appellant was sentenced to 30 to 60 months of incarceration at each count, to run concurrently with each other, and consecutively to the period of incarceration imposed for manufacture of methamphetamine.

supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where … the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the court[] below are subject to our plenary review.

*Commonwealth v. Perel*, 107 A.3d 185, 188 (Pa. Super. 2014) (quoting

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010)).

Appellant argues that the trial court erred in finding that Justin McIntyre consented, or even had authority to consent, to a search of the trailer. Appellant's Brief at 11-17. We do not reach this argument because we affirm the trial court's order denying the motion to suppress on another basis.[2]

This Court's decision in *Commonwealth v. Muniz*, 5 A.3d 345 (Pa. Super. 2010), is instructive here. In that case, the defendant challenged the trial court's denial of his motion to suppress based on the argument that "because the police's initial entry into [Muniz's] apartment … was predicated solely upon an arrest warrant for Timothy Baldwin, and not upon an arrest warrant for him or a search warrant for the premises, the search was illegal." *Id.* at 349. Muniz relied on *Steagald v. United States*, 451 U.S. 204 (1981), and *Commonwealth v. Martin*, 620 A.2d 1194 (Pa. Super. 1993) (*per curiam*), in support of his argument. The trial court and the Commonwealth

---

[2] This Court may affirm the trial court's decision on any valid basis. *Commonwealth v. Janda*, 14 A.3d 147, 161 n.8 (Pa. Super. 2011).

argued that the underlying facts were more appropriately considered under the holdings of **Commonwealth v. Stanley**, 446 A.2d 583 (Pa. 1982), and **Commonwealth v. Conception**, 657 A.2d 1298 (Pa. Super. 1995). This Court held that the appropriate analysis "harmonized application of all four cases[.]" **Muniz**, 5 A.3d at 350.

> Specifically, in **Steagald** the United States Supreme Court addressed the narrow issue of "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." **Steagald**, 451 U.S. at 212[]. In that matter, the authorities arrived at a location armed with an arrest warrant to arrest a fugitive. Prior to entry into the residence, they were confronted by the defendant/owner of the residence. The authorities explained that they were looking for a fugitive that they believed to be in the residence. The defendant/owner stated that she did not know the fugitive and denied the authorities entry into the residence. Nevertheless, the authorities entered and searched the residence, with the mistaken understanding that the arrest warrant provided them authority to search the residence. As a result of that search, the authorities found cocaine, but not the fugitive. The defendant/owner was arrested.

> On appeal, the United States Supreme Court explained the difference in the interests protected by arrest warrants and search warrants, and held that the arrest warrant naming a person who was not the owner of the residence was inadequate to justify the search of the defendant/owner's residence. Absent consent or exigent circumstances, the Supreme Court explained that a search warrant was required in such a case.

> Over ten years later, in [] **Martin**,[] this Court issued a *per curiam* opinion, reversing a denial of a suppression motion and vacating a judgment of sentence, finding the situation in that matter indistinguishable from **Steagald.** Of importance to both the **Steagald** and **Martin** decisions was the fact that the rights of the third party owner/possessor (and not the subject of the arrest

warrant) were being considered. In both cases, the evidence against the third party owner/possessor was suppressed.

In the **Stanley** matter, the Pennsylvania Supreme Court considered a similar situation, but that holding focused on the rights of the subject of the arrest warrant—not the rights of the third party owner/possessor. In **Stanley**, police received a tip that a fugitive was hiding in a woman's apartment. The police proceeded to the apartment, entered the residence and apprehended the fugitive. The fugitive challenged the entry into the woman's apartment, but the Court held that based upon the information provided in the tip, the police had "reason to believe" that the fugitive was within the residence. **Stanley** relied on the United States Supreme Court's holding in **Payton v. New York**, 445 U.S. 573[] (1980), that police armed with an arrest warrant and "reason to believe" that the subject of that warrant was within the suspect's own home could enter the home and arrest the suspect without a search warrant. The **Stanley** Court held that an arrestee has even less of a privacy interest in the home of another, so he could be arrested there.

Resolution of the combination of situations occurred in [] **Conception**,[] where we considered the Fourth Amendment rights of a third party when her residence was entered under the mistaken belief that it was also the residence of someone subject to an arrest warrant—a factual scenario nearly identical to this matter. In **Conception** the police showed up at the defendant's apartment with an arrest warrant for Robert Vargas and Martin Rivera, and a reasonable belief that they lived at the subject apartment. Instead of Vargas or Rivera, the defendant opened the door, stated that she did not know either man and refused the police entry into the premises. Nevertheless, the police forcibly entered the apartment and searched the premises for Vargas and Rivera. As a result of that search, the police found marijuana in plain view. The defendant was consequently placed under arrest.

On appeal, the defendant in **Conception** relied on **Steagald** for the position that, notwithstanding the arrest warrant for Vargas and Rivera, the police were required to have a valid search warrant to search her premises. However, in the **Conception** decision we distinguished **Steagald**, explaining that in **Steagald** the police understood the premises to belong to a third party. In **Conception**, however, the police believed the

apartment to be the residence of one of the subjects of the arrest warrant (*i.e.* Vargas). Therefore, although the individual asserting the Fourth Amendment rights in **Conception** was the third-party (as in **Steagald**), the person being searched for was believed to reside at the premises. Under this analysis, we held that **Stanley** was more applicable. Thus, because the authorities had a reason to believe that a subject of the arrest warrant lived within the premises, they did not need a search warrant to enter the premises to search for the suspects.

*Id.* at 350-51 (some citations and footnote omitted). Following the above analysis, this Court held that the officers' entry into Muniz's apartment was not illegal.

Here, the officers had an arrest warrant for Natasha Anthony. A reliable source informed the officers that she was currently residing at 20 Best Road with Justin McIntyre. Two parole agents accompanied the officers to 20 Best Road and encountered a belligerent McIntyre. At the request of his parole agent, McIntyre was taken into custody. Once handcuffed, McIntyre informed the parole agents that Anthony was in the first bedroom of the green and white trailer. The officers knocked on the door of the trailer to execute the arrest warrant and announced their presence. Receiving no response, the officers entered the unlocked trailer to apprehend Anthony. En route to the first bedroom where she was located, Officer Kerle observed several items that were immediately apparent as elements of a one-pot methamphetamine lab. After observing these items, the officers contacted the local state police barracks to apply for a search warrant to search the entirety of 20 Best Road.

Applying ***Muniz*** to Appellant's case, we find that the entry into the green and white trailer was not illegal. The officers had a valid arrest warrant for Anthony, and entered the green and white trailer based on reliable information that she was residing within. Based upon this reasonable belief and the arrest warrant for Anthony, the officers had a legal basis to enter the trailer to execute Anthony's arrest warrant, and the entry did not violate Appellant's Fourth Amendment rights. Consequently, Officer Kerle observed the methamphetamine lab items from a lawful vantage point as they were in plain view while he was executing the arrest warrant, and the items could be used as the basis for the subsequent search warrant. Accordingly, we find that the trial court did not err in denying the motion to suppress, albeit for a different reason. ***See Commonwealth v. Anderson***, 40 A.3d 1245, (Pa. Super. 2012) (stating that plain view doctrine applies where police observe an item in plain view from a lawful vantage point, and the incriminating nature of the item is immediately apparent) (citations omitted).

We next consider Appellant's claim that his two convictions of manufacture of methamphetamine with a child present should have merged with his single conviction for manufacture of methamphetamine. "Whether Appellant's convictions merge for sentencing is a question implicating the legality of Appellant's sentence. Consequently, our standard of review is *de novo* and the scope of our review is plenary." ***Commonwealth v. Baldwin***, 985 A.2d 830, 833 (Pa. 2009).

We begin by examining the merger doctrine.

### § 9765. Merger of sentences

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other.

***Baldwin***, 985 A.2d at 833.

When considering whether there is a single criminal act or multiple criminal acts, the question is not "whether there was a 'break in the chain' of criminal activity." The issue is whether "the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes."

***Commonwealth v. Pettersen***, 49 A.3d 903, 912 (Pa.[ ]Super. 2012).

In determining whether two or more convictions arose from a single criminal act for purposes of sentencing, we must examine the charging documents filed by the Commonwealth. ***Commonwealth v. Jenkins***, 96 A.3d 1055, 1060 (Pa.[ ]Super. 2014) (holding, consistent with our Supreme Court's jurisprudence, "We must determine whether [defendant's] actions ... constituted a single criminal act, with reference to elements of the crime as charged by the Commonwealth.") (internal quotation marks and citation omitted).

***Commonwealth v. Martinez***, 153 A.3d 1025, 1030–31 (Pa. Super. 2016).

Appellant argues that "the Amended Information only offers a vague summary of the offense describing 'numerous occasions.' There is no basis the jury (or the trial court) could find that the allegations, as described in the Criminal Information, justify the acts as separate and distinct from one another." Appellant's Brief at 20. However, Appellant's argument ignores the evidence presented at trial.

> Here, the Commonwealth's witnesses testified to seeing [Appellant] make methamphetamine on several occasions over several months, not just on the one occasion when the two children were present. Natasha Anthony testified that during the time she lived at the McIntyre property "Big Terry[," Appellant], would give her methamphetamine. She knew how to make it. She learned from [Appellant]. She watched him make it. She saw [Appellant] and two others making methamphetamine every day, usually at night. Natasha Anthony testified she saw [Appellant] and others making it and keeping the materials and ingredients in the green and white trailer located on the McIntyre property. She also stated she had seen [Appellant] manufacturing methamphetamine in front of Tonya Barger's two kids in the little brown and white camper. Because the fumes were burning her nose, she put a blanket over the little boy's head to try to protect him. Anthony testified she saw [Appellant] making methamphetamine in the gray handicap van, in the brown camper[,] and in the green and white trailer. On a couple of occasions Tonya Barger was there with the kids.
>
> Next, Melanie Brink testified that on nine occasions she purchased pills used for making meth and gave them to [Appellant] and she helped him and saw him crushing the pills. She saw Tonya Barger's children around one time when [Appellant] was making meth. She crushed pills to make meth in her car and she was in the trailer when others were making it. [Appellant] was with her in her car. There was a whole lot of shaking going on. She saw processes of making the meth take

place in her car, in the gray handicapped van, the green and white trailer, and in the brown camper and [Appellant] was present in all of those places helping with the making of meth.

Tonya Barger testified that [Appellant] is the grandfather of her two children. She was living with Derick Fowler for a couple months in a camper at the McIntyre property. Her kids are two and four years of age. She bought Sudafed to make meth at [Appellant's] request and with money he gave her five times and all five times she gave the pills to [Appellant]. He made meth with it. She saw meth being made two to three times per week, maybe more, and [Appellant] was involved each time. Her children were around and [Appellant] was present. In addition to this testimony, law enforcement officials testified that they found meth making materials in various locations on the McIntyre property.

Since the testimony clearly establishes that [Appellant] participated in making methamphetamine on multiple occasions and at multiple locations, the jury could have reasonably believed that [Appellant] committed this offense many times when it found him guilty. If so, the three offenses would not constitute a "single criminal act," regardless of whether one offense is a lesser included offense of the other.

Trial Court Opinion, 7/12/2017, at 2-4 (unnumbered) (citations omitted).

We agree with the trial court. The charging document states that Appellant manufactured methamphetamine "on numerous occasions between the dates of March 16, 2015 [,]and March 16, 2016[,]" Amended Criminal Information, 2/21/2017, at count 1; and manufactured methamphetamine with a child present "on numerous occasions[,]" *id.*, at counts 3 and 4. Based upon the language of the amended criminal information and the evidence presented at trial, we find that ample evidence existed to support the conclusion that Appellant committed multiple, distinct, crimes of

manufacturing methamphetamine, with and without children present. Accordingly, we discern no error in the sentences imposed by the trial court.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary


Date:  4/11/2018